# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

### Case No. 1-21-cv-23996-DPG

**DOMINIC HOWARD**
and **KAREN HAAS,**

      Plaintiffs,

vs.

**AIA HOLDINGS, INC., a Florida foreign corporation,
ALLEGHENY CASUALTY CO., a Florida foreign
corporation, INTERNATIONAL FIDELITY
INSURANCE CO., a Florida foreign corporation,
BANKERS INSURANCE CO., a Florida corporation,
BANKERS INSURANCE GROUP, INC., a Florida corporation,
BANKERS SURETY SERVICES, INC., a Florida corporation,
NATHAN FOLTZ, individually and d/b/a SOUTH SHORE
BAIL BONDS, CHARLES HOLLAND, individually,
CHARLES HOLLAND, INC., a California corporation, d/b/a
GOLD COUNTRY BAIL BONDS and CHI , MICHAEL WHALEN,
individually, SULEIMAN HABIB YOUSEF, individually,
BRIAN KESNICK, individually, BRIAN RODRIGUEZ, individually,
and JIMMY PATRONIS, in his official capacity as Chief
Financial Officer, State of Florida Department of Financial Services.**

      Defendants.

_____/

## AMENDED COMPLAINT FOR DAMAGES, DECLARATORY AND INJUNCTIVE RELIEF, AND DEMAND FOR JURY TRIAL

Plaintiffs, Dominic Howard (Howard), by and through undersigned counsel, and Karen

Haas (Haas), in proper person, sue Defendants AIA Holdings, Inc., a Florida foreign corporation

(AIA); Allegheny Casualty Co. (Allegheny), a Florida foreign corporation; International Fidelity

Insurance Company (Fidelity), a Florida foreign corporation; Bankers Insurance Company

(Bankers), a Florida corporation; Bankers Insurance Group, Inc.(BIG), a Florida corporation;

Bankers Surety Services, Inc. (BSSI), a Florida corporation; Nathan Foltz (Foltz), individually

and d/b/a South Shore Bail Bonds; Charles Holland (Holland), individually; Charles Holland,

Inc. (Holland, Inc. or CHI ), a California corporation, d/b/a Gold Country Bail Bonds and CHI;

Michael Whalen (Whalen), individually; Suleiman Habib Yousef (Yousef); individually, Brian

Kesnick, individually, Brian Rodriguez, individually, and Jimmy Patronis (FLDFS), in his

official capacity as Chief Financial Officer, State of Florida Department of Financial Services,

and allege as follows:

## INTRODUCTION

1. This action for damages, costs, and attorney's fees is brought pursuant to the Racketeer

Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1961-68 against a number of

defendants who harmed Plaintiffs to their business and property by engaging in collection of

unlawful debt and a pattern of racketeering activity including kidnapping, hostage taking,

extortion and extortion under color of official right,  bribery, money laundering, extortionate

credit transactions, interstate mail and wire fraud, and obstruction of justice. Defendants include

without limitation, persons (bail industry participants) who took actions and conspired to defraud

Plaintiffs and others by preparing false documents and forged bail bonds, and then took actions.

The purpose of the RICO enterprise is to illegally retain or extort bail and bail premium, all

acting in concert to make their cut of the bail bond premiums. Plaintiff was objectively and

lawfully at his mother's residence in Miami, Florida on Thanksgiving weekend Defendants

claimed Plaintiff was bailed out of jail in California, and that Plaintiffs had supposedly paid for

that. Defendants demanded payment and interest on this forged bail contract. The end result was

harm to Plaintiffs business and property by multiple threats and actual violent armed episodes

against Plaintiffs and others.

2. The RICO statute has a congressional objective of encouraging civil litigation not merely to compensate victims but also to turn them into private attorneys general, supplementing Government efforts by undertaking litigation in the public good.

3. Plaintiffs also seek declaratory and injunctive relief against the Chief Financial Officer, State of Florida Department of Financial Services (FLDFS), pursuant to 28 USC §§ 2201 and 2202 for policies as to content on the Surety/bail Agent Licensee Identification (ID) Card that are so overbroad and misleading as to violate the Fourteenth Amendment right to due process and equal protection. 42 U.S.C. § 1983 (1). FLDFS's Surety Agent Licensee ID Card states the holder of the card may make an arrest of a bailee, appearing to immunize the holder of the card from an unlawful arrest. Yet anyone passing a surety test may obtain that ID card. The policy of freely providing these ID cards contradicts state law prohibiting bounty hunters and requiring any bail agent be qualified and licensed by the State, and appointed by the insurer. Fla. Stat. § 648.30.

## JURISDICTION AND VENUE

4. The Court has jurisdiction over this action under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1964(c), and 28 U.S.C. § 1331, and applicable principles of supplemental jurisdiction under 28 U.S.C. § 1367(a), in that the RICO claims arise under the laws of the United States, as do the claims for the declaratory and injunctive relief per 18 USC § 2201, so related to the RICO claims that they form part of the same case or controversy.

5. Venue is proper under 28 U.S.C. § 1391(b)(1),(2), and (d) and 18 U.S.C. § 1965. Plaintiffs reside in Miami-Dade County and their business and property are located here. Defendants Bankers, BIG and BSSI are Florida corporations, and Defendant Yousef, resides in the Southern District of Florida. A substantial part of the events and omissions giving rise to

3

Plaintiffs' claims occurred in this District, however, some significant events also occurred in California, and this Court will be required to apply California law to those events.

**PARTIES**

6. At all times material hereto, Plaintiffs, Dominic Howard (Howard) and Karen Haas (Haas), were and are residents of Miami, Miami-Dade County, Florida, who sustained injuries to their business and property by reason of Defendants' engaging in collection of unlawful debt and a pattern of racketeering activity. Plaintiff, Haas, is an AV-ranked attorney with an appellate and trial practice, and former Miami-Dade prosecutor.

7. Defendant, AIA Holdings, Inc. (AIA) was and is a Delaware corporation made up of Defendants Allegheny and Fidelity, and a third company, Associated Bond. AIA is self-described as the nation's "oldest and largest family of bail bond insurance companies," and is the public face of Allegheny and Fidelity. A Google search for either Allegheny or Fidelity directs the user to AIA's website, www.aiasurety.com. AIA has its principal place of business in Calabasas, California. Under a Managing General Agent agreement between AIA and Fidelity, AIA engages in all bail bond marketing and underwriting on behalf of the Allegheny, Fidelity, and the Associated Bond consortium. AIA supports the bail sales agents whose bonds Allegheny and Fidelity underwrite, per AIA's website, with "24/7 Agent Support."

8. Defendant, Allegheny Casualty Co. (Allegheny), at all times material hereto, was and is a New Jersey licensed insurance corporation, registered and qualified to do business in the State of California and the State of Florida, and was and is acting as the surety. Allegheny is a subsidiary of Fidelity.

9. Defendant, International Fidelity Insurance Company (Fidelity) was and is a New

4

Jersey corporation, with its principal place of business in California, registered and qualified to do business in the State of California and the State of Florida.

10. Generally, AIA, Allegheny, and Fidelity's names appear together on websites, producer and sub-producer applications and contracts with their licensed and appointed bail agents, and emails to and from the bail sales agents. Collectively, AIA, Allegheny, and Fidelity will be referred to as "AIA Group."

11. Defendant, Bankers Insurance Company (Bankers), at all times material hereto, was and is a Florida corporation, organized and existing under the laws of the State of Florida, qualified to do business in the State of California and the State of Florida, with its principal place of business in St. Petersburg, Florida, and was and is acting as the surety. It is Bankers' name which appears on contracts with licensed and appointed bail agents, bail bond contracts, and powers of attorney.

12. Defendant, Bankers Insurance Group (BIG), at all times material hereto, was and is a Florida corporation, organized and existing under the laws of the State of Florida, qualified to do business in the State of California and the State of Florida, with its principal place of business in St. Petersburg, Florida. It is a subsidiary of Bankers Financial Corporation and the corporate parent of their insurance companies. BIG'S name also appears with Bankers on the bail bond contract.

13. Defendant, Bankers Surety Services, Inc. (BSSI), at all times material hereto, was and is a Florida corporation, organized and existing under the laws of the State of Florida, qualified to do business in the State of California and the State of Florida, with its principal place of business in St. Petersburg, Florida. It is a managing general surety agent for Bankers Insurance

Company (Bankers). Michael Whalen (Whalen) was its Executive Vice-President until 2011.

14. Collectively, Bankers, BIG, and BSSI will be referred to as "Bankers Group."

15. Defendant Nathan Foltz (Foltz), at all material times hereto, was a non-resident of the State of Florida, residing in the State of California, owner and d/b/a South Shore Bail Bonds, and Agency Bail Bonds of Tahoe. He was and is an employee/agent of Holland/Holland, Inc. and has power of attorney as a subproducer to act as agent of Bankers Group, and power of attorney as a producer to act as agent of AIA Group. He is a California bail bond agent, License # 1841566. Foltz was an authorized agent/subproducer named and appointed to transact on behalf of Bankers, BIG and BSSI as of February, 2005 until February 13, 2017, with Holland as his general agent/supervising producer from February, 2005, then Holland, Inc. from January, 2013. Alternatively, Foltz's employer effective February 9, 1999 is Holland, and Foltz is authorized to transact on behalf of Holland, Inc. effective December 13, 2007. Thus at all material times, Foltz is an authorized agent on behalf of Bankers. Foltz also is and was an authorized agent/producer named and appointed to transact on behalf of AIA Group effective August 8, 2015. Foltz was also acting as employee/subagent of Holland and Holland, Inc.

16. Defendant Charles Holland (Holland), at all times material hereto, was a non-resident of the State of Florida, residing in the State of California, and employer/principal of Defendants Foltz and Yousef; and has power of attorney as a producer to act as agent for Defendants Bankers Group, and Defendants, AIA Group. Holland is an experienced bail bondsman in the Lake Tahoe/Placerville area. He is a California bail bond agent, License #1841111. Holland was and is an authorized general agent/supervising producer named and appointed to transact on behalf of Bankers, BIG and BSSI effective April 13, 1998 for Holland. Holland also was and is an

authorized agent/producer named and appointed to transact on behalf of AIA, Allegheny and Fidelity effective July 27, 2015. He was and is a personal friend of Judge Steven C. Bailey.

17. Defendant Charles Holland Inc. (Holland, Inc.), at all times material hereto, was and is a California corporation, organized and existing under the laws of the California, qualified to do business in the State of California and doing business as Gold Country Bail Bonds, Charles Holland Bail Bonds, Aaronic Bail Bonds, Hangtown Bail Bonds, Absolve Bail Bonds, and North State Bail Bonds (collectively referred to as "Gold Country Bail Bonds, et al") and is employer/principal of Defendants Foltz and Yousef, with power of attorney as a producer to act as agent for Defendants Bankers, BIG and BSSI, and Defendants AIA, Allegheny and Fidelity. Holland, Inc. has a California bail bond agent license #1844429, which lists five (5) bail agent employees. Holland, Inc. is and was an authorized general agent/producer named and appointed to transact on behalf of Bankers, BIG and BSSI effective December 13, 2007; and is and was an authorized agent to transact on behalf of AIA, Allegheny and Fidelity effective July 27, 2015. Charles Holland, Inc. also does business as "CHI,"  providing probation services of electronic monitoring for out-of-county residents for the El Dorado County Probation Department, and as such will be referred to as "CHI."

18. Defendant Michael Whalen (Whalen), at all times material hereto, was and is Vice-President of Defendants AIA, Allegheny and Fidelity since 2011; and formerly was Executive Vice-President of BSSI. Whalen supervises  Foltz, Holland/Holland, Inc. at AIA, and previously supervised them at BSSI. When Whalen left Bankers for AIA Group in 2011, Foltz, Holland, and Holland, Inc. followed him to AIA Group, in July and August of 2015. Whalen is an officer or director at the executive level for AIA. Whalen currently works and resides in Naples, Florida.

7

Whalen knew of and agreed to facilitate the predicate offenses for which AIA Group is vicariously liable.

19. Defendant Suleiman Habib Yousef (Yousef), at all times material hereto, was and is a resident of Miami, Miami-Dade County, Florida, and employee/agent of Defendants Foltz, Holland, and Holland, Inc., and agent of AIA Group. Yet, according to the laws of California and Florida, at no point was Yousef lawfully allowed to take any actions on a bail bond contract for any of the defendants. Yousef  was and is an illegal fugitive recovery agent, also known as a bounty hunter. He dressed in all-black tactical uniform w/black ballistic vest, armed himself with firearms, Taser, carried at least one law enforcement style badge, wore a large patch on his vest reading 'AGENT,' and wore a body camera on his chest recording footage of himself kidnapping his victims, and advertised his services on social media. He opened his own bail agency/office of International Defense Organization Corporation, at least from September 27, 2013 through September 22, 2017, and promoted it on the internet. Since April 15, 2021, he now has a bail agency/office of International Defense Organization, LLC.

20. Defendant Brian Kesnick (Kesnick), at all times material hereto, was and is since 2011, Senior Vice-President/Director of Defendant Bankers and CEO/President/ Director of BSSI. Kesnick supervises Foltz, Holland/Holland, Inc. at Bankers/BSSI. On February 13, 2017, Kesnick terminated the agency of Foltz  by Bail Agent Action Notice to the Department of Insurance, California, without disclosing that he had reason to believe the agent may have violated the California Insurance Code. Kesnick is an officer or director at the executive level for Bankers and BSSI. Kesnick currently works in St. Petersburg, Florida. Kesnick knew of and agreed to facilitate the predicate offenses for which Bankers Group is vicariously liable.

8

21. Defendant Brian Rodriguez, at all times material hereto, was an appointed bail agent of Bankers from 2009 through July, 2020, and appointed bail agent of Allegheny and Fidelity from 2010 through July, 2020. He was owner of Free Bird Bail Bonds, in Doral, Florida, and directed Holland/Holland, Inc. to Yousef, an illegal fugitive recovery agent.

22. Defendant, Jimmy Patronis, at all times material hereto, was and is Chief Financial Officer, State of Florida Department of Financial Services (FLDFS), Tallahassee, Florida, and is sued in his official capacity.

## NON-PARTY PARTICIPANTS

23. AIA Group Vice-President Ed Sheppard, along with Whalen, controlled, instructed, and advised the day to day operations of Holland/Holland,Inc. as to fugitive recovery activities, providing names of bounty hunters.

24. AIA Group Loss Control Manager Jimmy Moscoso, on or about June 19, 2017, recommended Rodriguez to Whalen, as someone who could provide names of bounty hunters, and on or about February 15, 2018, another name of Rolando Betancourt.

25. At all times material hereto, Bradley Laird Clark (Brad Clark), was and is a California attorney, self-employed as Brad Clark, Attorney at Law, and was the attorney and registered agent for Holland/Holland, Inc., a/k/a CHI. He was a personal friend of Judge Steven C. Bailey, and gave gifts and items of value to Judge Steven C. Bailey. He currently resides and practices law as an Alaskan attorney in Thorne Bay, Alaska.

26. Former Judge Steven C. Bailey, S. Lake Tahoe Superior Court of California, County of El Dorado, took actions on February 21, 2017 as to Plaintiff, Howard. The State of California Commission on Judicial Performance (CJP) subsequently commenced an inquiry into his actions

9

and close relationship with CHI, Holland, Inc., Holland and Bradley Clark, including the judge's son working as a manager for CHI , the private probation service provider.

27. Former Judge Suzanne N. Kingsbury, Lake Tahoe Superior Court of California, County of El Dorado took actions on February 10, 2017 and other dates as to Howard. She and Judge Bailey were the only two judges assigned to that courthouse. After being subpoenaed to testify at the CJP hearings, she has taken early retirement.

28. Unnamed bail agent employees of Defendants, Holland and Holland, Inc., whom Holland assigned, on or about the end of March, 2014 through July, 16, 2014 to follow the movements of the contender for District Attorney, El Dorado County, Judson Henry. This interference with an election included retrieving Judson Henry from his daughter's soccer game and taking him to Holland's office, after which meeting Mr. Henry resigned from the election, and the current District Attorney ran unopposed.

29. At all relevant times, each and every non-party was acting in concert with, or as an agent for, one or more of the RICO Defendants, and further, as described in more detail below, conspired with one or more of the other RICO Defendants to perform the acts alleged herein.

## OVERVIEW OF THE BAIL INDUSTRY

30. In exchange for a nonrefundable premium paid by a defendant--ten percent of the bail amount in most jurisdictions--a surety promises the court that the defendant will appear. If the defendant does not appear, the surety owes the court the full bail amount. Because the commercial bondsman has a financial interest in ensuring that the defendant appears in court, the surety has an incentive to monitor the defendant and, if necessary, arrest the defendant and force them to appear. The popular image of bounty hunters in the Wild West thus provides a

10

reasonably accurate representation of how the industry operates.[1]

31. In a post-Civil War era case, <u>Taylor v. Taintor</u>, 83 U.S. 366 (1872), the surety lost in the United States Supreme Court. However, *dicta obiter* asserted that at common law a bounty hunter had authority to pursue, seize, and return the bail jumper by any means necessary. "The bounty hunting industry cruised along below the radar screen for over a century while the nation remained oblivious to who bounty hunters really were, how they did their work, and their treatment of fugitives and others who got in their way."[2]

32. "That changed in August 1997 when five men wearing ski masks – common criminals posing as bounty hunters – burst into a Phoenix home early in the morning, held three children at gunpoint, and killed a young couple in bed. Although the intruders were imposters, the brutal deaths of innocent victims sparked a national debate over bounty hunter misconduct, their recovery tactics, and the proper limits of their authority. The press and politicians vilified bounty hunters in general for the unnecessary use of force in arresting defendants and their terrorizing tactics against bewildered, helpless third parties, abuses that occurred because too many fugitive recovery agents "are modern vigilantes operating in an industry that has little oversight, if any, and no regulation." *Id.*

33. After the 1997 Phoenix murders, and the wave upon wave of legislation passed in the years that followed by a majority of the states, what in the 1800's Wild West could have been considered legal under common law, is now in the majority of the states considered felonies.

---

[1]CORPORATE MANIPULATION OF COMMERCIAL BAIL REGULATION, J. Gordon, 121 Colum. L. Rev. F. 115 (June 1, 2021).

[2]"Reining in Bounty Hunters, 21-Fall Crim. Just. 4, Robin, Gerald D.

34. Common law has been superseded by statute in Florida and California. If anyone in the bail industry intends to return a bailee to the court, if it is done in violation of the law, it is kidnapping. In fact, a number of states have outlawed bounty hunters, Florida among them. Florida law prohibits bounty hunters and requires any bail agent be qualified and licensed by the State, and appointed by the insurer. Fla. Stat. § 648.30. Licensure and appointment required (2002). The legislature has placed supervisory responsibility for the provisions of this Chapter on the Department of Financial Services. Fla. Stat. § 648.26. Department of Financial Services; administration (2003). It is a function of the Department of Financial Services to determine if Yousef was qualified, licensed, and appointed.

35. California and common law provides that when the surety wants to cancel a bail contract prematurely, without fulfilling the terms of the bail contract, the surety through its agents simply delivers the defendant to the jail. That lawfully ends the bail bond contract and the surety's liability to the court. When that occurs, the bailee is entitled to a return of any premium paid. The defendant may then post a cash bail through the clerk during business hours.

36. California law is very clear  there are only ten statutorily enumerated reasons[3] where the court has any authority to exonerate a bail bond.

37. California law is very clear that rate filings govern the amount of bail premium that may be charged.

38. California law is also very clear that for a judge to modify a bail amount, there must be a noticed hearing on the appropriate bail amount, with the defendant and his attorney present.

_____

[3]Cal. Penal Code §§§§§§§§ 997,1000.2,1001.27,1001.53, 1008, 1195, 1300, 1305, 1305.6,1117.

12

A bail contract may not be unilaterally modified without due process of law.[4]

39. Bail agents are sales agents of the sureties. Sureties are supposed to provide bail contracts that conform to state law, and producer contracts for their bail agents that reflect a bail bond is an insurance contract by the sureties.

40. There are approximately 25,000 individual bail bond agents nationwide, but the majority of their business is underwritten by only nine (9) insurance companies, including Bankers, and Allegheny and Fidelity as part of Defendant AIA Group. These nine companies control the thirty surety corporations that underwrite the vast majority of the $14 billion in bail bonds written each year, of which surety companies collect about $ 1.4 to $ 2.4 billion annually.[5]

41. Today, states requires commercial bondsmen to contract with a national surety company in order to write bail on behalf of arrestees. Surety companies profit by taking a cut of the normally nonrefundable premium – usually ten percent. *Id.*

42. The surety companies are treated as regulated insurance products, yet

---

[4] For instance where a judge unilaterally modified a bail contract without due process of law, the State of California Commission on Judicial Performance on September 14, 2018 instituted formal proceedings against a judge in a nearby county:

> After the hearing, and outside the presence of the parties, you abused your authority by directing that the minute orders in each case reflect that bail was exonerated and reset at $25,000. By increasing bail in the defendant's absence and without a hearing on the appropriate bail amount, you failed to accord the defendant and her attorney the full right to be heard according to law.

https://cjp.ca.gov/wp-content/uploads/sites/40/2019/11/Laettner_DO_Removal_11-06-19.pdf. The Commission found that constituted misconduct, and for that and other reasons, removed him from office.

[5] Color of Change & ACLU, *Selling Off Our Freedom: How insurance corporations have taken over our bail system*, 6–7, 22 (May 2017), https://www.aclu.org/sites/default/files/field_document/059_bail_report_2_1.pdf.

13

unlike all other forms of insurance, bear no or almost no risk of loss. This is because surety companies integrate a scheme into their contracts with commercial bondsmen which require bondsmen to set aside an additional portion of the premium paid by the arrestee – usually another ten percent – to a "build-up fund," an account otherwise inaccessible to the bondsman that must be depleted before the surety company pays anything. The result of this business model is that the bail surety industry bears essentially no risk while earning about $ 1.4 to $ 2.4 billion in revenue annually. AIA, a surety company that has existed for over 100 years--and currently underwrites about $700 million in bail bonds annually--has never paid the state for bail forfeiture.

43. AIA acknowledges that bail agents are responsible for any forfeitures or other such losses, and because of this, AIA "sustained no losses on this book of business in 2015 and 2014.[6] AIA's chief legal officer stated, "You know how many checks this company has written to pay a bail loss? Not a single one."[7] Nor does Allegheny or Fidelity experience any losses related to its bail portfolio.

## STATEMENT OF FACTS

44. On May 4, 2014 Howard was arrested on a victimless misdemeanor in California. Plaintiffs wanted to pay cash for the $ 2,500 bail bond, but it was impossible to arrange from Miami, Florida, as it was the weekend and the clerk's office,  Lake Tahoe Superior Court of

---

[6]Allegheny Casualty Company, International Fidelity Insurance Company, *Management Discussion and Analysis of Financial Condition and Results of Operations for the year ending December 31, 2015*, (March 23, 2016),
https://interactive.web.insurance.ca.gov/sdrive/companyprofile/2015/propertyAndCasualty/annual/13285.2015.P .AN.PM.O.A.3107706.pdf.

[7]Shane Bauer, *Inside the Wild, Shadowy, and Highly Lucrative Bail Industry*, Mother Jones (May/June 2014).

California, County of El Dorado, was closed. Instead, Plaintiffs negotiated the terms of the bail contract with bail agent Foltz, agreeing to a one-time payment of $ 200 total premium for the $ 2,500 bail bond. Bankers/BIG bailed out Howard on that date through its bail sales agent Foltz using their power of attorney.  See, Bankers/BIG's Bail Bond Contract and receipt attached hereto as "Ex. A."

45. At all times attempting to enforce Howard's rights, Plaintiffs contested the proceedings from May 4, 2014 through March 14, 2018. During discovery, Howard believed a jury was entitled to see the police videos of Howard's alleged misdemeanor, and took an interlocutory appeal. A year passed before oral argument.

46. Prior to oral argument November 20, 2015, Howard's California attorney John Ward wrote to the panel advising he couldn't attend oral argument due to daily radiation treatments for cancer. See, Letter from John Ward, attached hereto as "Ex. B."

47. Also prior to oral argument, Foltz in California telephoned Haas, the indemnitor in Florida saying the appeal had gone on too long. and the surety needed more money. Haas reminded him he was talking to an attorney, and the contract didn't provide for additional premiums. Haas believed that was the end of it. Indeed, another year passed before an order was obtained on the interlocutory appeal.

48. On or about November 28th, 2016, Plaintiff Howard was objectively and lawfully at his mother's residence in Miami, Florida on Thanksgiving weekend.

49. Howard's California attorney John Ward's brain tumor worsened, and on February 3, 2017, moved to withdraw from the case. At hearing on his motion  February 10, 2017, John Ward was unable to attend due to a series of snowstorms, but his motion was granted. A bench

15

warrant was issued  but "held" pending hearing on February 21, 2017, when his presence was demanded to once again announce his plea of not guilty.

50. Lake Tahoe was suffering from one of the worst winters in recorded history. The elevation of the Superior Court of California, County of El Dorado in South Lake Tahoe, California is approximately 6,225 feet. The only way to access the courthouse is by transversing one of several summits of mountain ranges that surround the South Lake Tahoe basin. There are no tunnels. A plea sounding hearing was set for February 21, 2017,  requiring Howard's attendance. On February 20, 2017, a blizzard struck El Dorado County, California, with wind gusts in excess of 150 miles per hour (the equivalent of a Category 5 hurricane), and highways closed due to white-out conditions, mudslides and avalanches. See, Winter Storm Warning dated February 20, 2017, attached hereto as "Ex. C." Prior to the hearing on the morning of February 21, 2017,  Haas/Howard faxed an emergency written and/or plea of not guilty and motion for continuance to Judge Steven C. Bailey, based upon it being impossible to reach the courthouse as roads were closed, and confirmed receipt of the fax by telephone.

51. Despite the blizzard and road closures, Judge Steven C. Bailey refused to grant a faxed motion for continuance, or allow Howard to provide a not guilty plea by telephone and facsimile. However he could make a remote appearance on the condition he plead guilty and accept by fax all terms of the plea, including probation and remote monitoring by CHI and monthly payments to CHI (owned by Holland, Inc., his bail agent). See, Electronic Monitoring Notice, attached hereto as "Ex. D." This was communicated on or about 10:00 A.M. on February 21, 2017, by the deputy clerk Jackie Davenport Assistant by telephone to Haas and Howard. Howard refused. Judge Bailey, in Howard's absence and without a hearing on the appropriate

16

bail amount, entered a bench warrant and raised the bail to $ 25,000. Nor did the court provide written notice, either before or after the fact, of the rise in bail.

52. On Friday, April 14th, 2017 Foltz in California telephoned Haas in Florida, claiming that on February 21, 2017,  the judge had raised Howard's bail to $ 25,000, and Foltz was forced to pay that premium by the court, so Plaintiffs owed $ 2,500 on that new bail. Further, he claimed Plaintiffs owed the full amount on the old November 28, 2016 bail bond. Plus, the interest was accruing daily on those amounts, and every day that goes by, Plaintiffs would owe more. He communicated that all the legal problems would go away if they just paid the debts. Haas didn't believe him, as neither Foltz nor the court had sent written notice raising the bail.

53. Haas objected, and Foltz became irate and threatened, "You're going to pay one way or another, bitch." During that same telephone call, at 2:08 P.M.(ET) Haas advised Foltz she was in communication with various agencies, including the Department of Justice and the California U. S. Attorney's office about the irregularities of the court relating to the Howard matter. Foltz in California continued to telephone Haas's law office in Florida dozens of times that weekend, making threats and demanding payment. Haas still didn't believe him.

54. Approximately June, July, August and September, an unknown person who later became known as Yousef. scoped out Plaintiffs' residence and yard, trespassing in their private yard while openly heavily armed and wearing a ballistic vest displaying the word "Agent." His visits included shouting and banging on doors and windows. His costume and open carry of weapons alarmed Haas/Howard and neighbors. Yousef telephoned and left notes in Haas's mailbox with threats and demands. Figure 1.

55. On or about November 13, 2017, Yousef, openly carrrying firearms and Taser and

17

dressed in military garb including ballistic vest, with no idea where Howard was, forced his way into Plaintiffs' home, destroying the lock, and grabbing Haas by the arm and pushing Haas from the living room down a hallway to her bedroom while aiming a laser Taser at her and screaming he was going to Tase her. She momentarily freed herself, as he had to let go of her to shoot her with the Taser, or he would be Tased himself. She went for her gun holster laying open on the bed, and Yousef turned and ran out of the house yelling he was shooting, and on the porch aimed extended clip Firearm at her chest while screaming and threatening to kill, injure, or continue to detain her. She slammed the door on him and braced it. Yousef kicked the door, but it didn't give. Haas called 911. Yousef did not leave the front yard. At no point on that date did Yousef see, hear, or have any idea where Howard was. Figures 2, 3, 4.

56. Police responded. Seven of the officers wore video bodycams and recorded Yousef. He showed them an ID card claiming to be a bail surety agent, said he worked for Freebird Bail Bonds, and showed a "controlled document" purporting to be from El Dorado County, and a document purporting to be from Allegheny. Plaintiff Haas insisted the surety was Bankers and that Yousef was not a bail agent. He was not arrested at the time.

57. On that date, Yousef videoed the incident without consent.

58. On or about November 27, 2017, Holland in California telephoned Haas in Florida, laughing, saying he'd seen Yousef's video. He stated the sureties had sent Yousef.

59. About that time, Plaintiffs discovered the video Yousef published to the public on the internet. It contained the images of Haas in her home, office, and bedroom in apparent advertising to promote Yousef's services, and denigrate Haas including as an attorney and as to her law practice, and Howard.

18

60. Plaintiffs also discovered Yousef's multiple violent videos he had published to the public on the internet, including of himself armed and "sport tasing" unsuspecting victims, kidnapping them, and transporting hand-cuffed persons onto a commercial airline flight, including but not limited to, from Miami to Las Vegas. The videos showing unprovoked random acts of violence which instilled fear in Howard and Haas as to the violence he was capable of, and what could happen if he came back, not only to themselves but also to anyone associated with Haas's law practice. Figures 5 – 11.

61. On or about May 31st, 2018, following a State of Florida Department of Financial Services, Division of Investigative and Forensic Services, Bureau of Insurance Fraud Investigation, Detective Jose Andrade arrested Yousef arrested on four felonies of:

      a. Bail Bond Agent/Not Qualified, Licensed or Appointed (Fla. Stat. § 648.30);

      b. Trespass/Structure, Conveyance/Dang. Weap. Firearm § 810.08(2)(c);

      c. Battery/On Person 65 or Older § 784.08(2) (c);

      d. Assault/Aggravated/With a Firearm § 784.021(1)(a),

all arising out of his specific conduct and actions of November 13, 2017. Holland/Holland, Inc., who had solicited the felonies, bailed Yousef out under the name Sala Suarez/CHI.

62. On or about September 12, 2018, Yousef was charged in an unrelated case with an additional eight (8) felonies, two counts each of:

      a. Uttering Forged Instruments;

      b. Identification/Personal/Fraudulently Use/Possess;

      c. Grand Theft 3rd Degree; and

        d. Security Officer/Fraudulent Training Certificate Possession or Sale.[8]

These charges all relate to the signing and sale of forged security license training certificates using assumed instructor names. The instructors whose names were used on the security license training certificates on March 31, 2017 were Ronald Amerson and John Goldsboro, neither of whom taught classes in Miami Dade County. The victims who received the fraudulent Training Certificates were Bryan Borges on March 31, 2017 and Jake Hodges on April 14, 2017 .

      63. On November 30, 2018, Yousef was arrested again on those felonies. On or about December 3rd and 4th, 2018, Holland flew to Miami from California, and Holland, Inc./CHI bailed Yousef out of jail on the eight (8) new charges.

      64. On or about February 2, 2021, Defendant Yousef posted a new, over thirty-five minute video that has received thousands of views, again showing his version of the video taken November 13, 2017. He refers to Plaintiff Haas as an appellate attorney who was breaking the law, and Plaintiff Howard, and maligns Haas and her law practice, and Howard. Yousef again displays the images in apparent advertising on the internet to promote his services, and threatens that Haas and Howard must cease their claims against him,

      65. On or about May 7, 2018, the State of California agency responsible for overseeing state judges, The State of California Commission on Judicial Performance (CJP), publicly announced an inquiry for numerous charges of judicial misconduct against Judge Bailey.

      66. On June 5, 2018, Plaintiffs obtained Howard's entire South Lake Tahoe, Superior Court of California, County of El Dorado file. The file showed there were several Orders on Mr. Ward's Motion to Withdraw heard February 10, 2017. One Order simply granted the motion.

---

[8]Fla. Stat. §§§§ 831.02; 817.568(2)(A); 812.014(2)(C), and 493.6120(7).

In another Order, backdated, Judge Kingsbury, in Howard's absence, conditioned Howard's appearing through counsel upon his pleading guilty:

> If case resolves by plea, Defendant can appear through counsel if properly executed plea form is presented to the court.

Order dated February 14, 2017.  The minutes reflect a bench warrant was issued by Judge Kingsbury, but "held" pending hearing on February 21, 2017, when Howard's  presence was demanded. Similarly, as to the February 21, 2017 hearing during the blizzard,  notes in the file waived Howard's personal appearance if he pled guilty. One order stated Howard was to appear at the next hearing, another dated February 13, 2017 forfeited the bail, backdated to February 10, 2017, and set it to $ 15,000. On February 21, 2017, then Judge Steven C. Bailey raised Howard's bail to $25,000.

67. The file also showed Foltz had purported to "cancel" the Bankers bail contract on November 28, 2016  and "place" it with Allegheny. Foltz claimed Howard was bailed out of jail in California, and Plaintiffs had supposedly paid for that. On that date Foltz, through his power of attorney with Bankers Group, decided Bankers Group would have no more liability for Howard's bail contract.

68. On that same date and place, Foltz also decided Bankers  Group would have no more liability for bail contracts belonging to other third parties, including William Carlen (for $ 1500 and $2500), also pending in that Superior Court of El Dorado County, California.

69.  Foltz misrepresented to the clerk of the court that it had been a busy Thanksgiving holiday, and that Howard and others were in jail, but actually, no legally permissible reasons for cancelling the bail applied. The clerk, as a ministerial act, filed papers exonerating Bankers

Group of all liability on the bond based upon Foltz's representations, and on that date mailed a copy to Foltz and Bankers. At no point did any judge have any involvement in the exoneration of Bankers Group's bond.

70. On that same date and place, nor any future dates, neither Foltz nor Bankers Group provided any Notice of Exoneration to Plaintiffs or their California attorney. This was nondisclosure of material information, even in the absence of any patently false statements.

71. Also on November 28th, 2016, bail agent Foltz, using his Allegheny Power of Attorney within his scope of authority, placed a fraudulent bail bond and a forged contract with AIA Group for multiple individuals, including Plaintiff Howard. Foltz caused the clerk to mail copies to Foltz and Allegheny. As to the premium, Foltz invested Howard's previously paid $ 200 premium from the Bankers contract, added another $ 50 from previous instances of racketeering activity, and sent $ 250 to Allegheny for a bail premium on the fraudulent bail bond. Allegheny's computer system documented receiving $ 250 in premium from Howard on that date. Plaintiffs objectively did not ever pay any premium other than the $ 200 required by the Bankers contract May 4, 2014.

72. After Foltz handed the clerk the new Power of Attorney on the fraudulent bail contract, he did not return to Howard/Haas the $ 200 deposit on the Bankers/BIG premium, but instead sent that, and another $ 50 from his business account to Allegheny. See, Receipt to Allegheny, attached hereto as "Ex. E."

73. On that date and place, nor on any future dates, neither Foltz nor AIA, Allegheny, or Fidelity provided any Notice of the fraudulent bail bond and forged contract to Plaintiffs or their California attorney John Ward. This was nondisclosure of material information, even in the

absence of any patently false statements.

74. On that date of November 28th, 2016, and place, Foltz also placed fraudulent bail contracts for other third parties, including for William Carlen (for $ 1500 and $2500) that were pending in the Superior Court of El Dorado County, California with Defendants AIA Group.

75. On February 13, 2017, the El Dorado Court forfeited the forged bail bond with Allegheny. On that same date, Kesnick, Bankers Senior Vice-President and BSSI's CEO/President, completed and mailed a Bail Agent Action Notice to the California Department of Insurance terminating Foltz's agency with Bankers, while falsely stating "N/A" to the question of whether Bankers was terminating the appointment because of "reason to believe the agent may have violated the California Insurance Code." See, Bail Agent Action Notice dated February 13, 2027, attached hereto as "Ex. G". This was a patently false statement, and nondisclosure of material information.

76. The file also showed that approximately June, 2017, Foltz contacted Holland/ Holland, Inc. for assistance in returning Howard to California on the forfeited and forged bail bond.

77. Plaintiffs later learned that Holland/Holland, Inc. sought names of possible individuals from Whalen at AIA Group, to assist in returning Howard to California.

78. On or about June 19, 2017, Jimmy Moscoso, Loss Control Manager for AIA Group provided the name of Rodriguez to Whalen, to provide to Holland/Holland, Inc.

79. On or about June 26, 2017, Rodriguez, knowingly and intentionally recommended Yousef to Holland/Holland, Inc.. He thus provided Holland/Holland, Inc. with the contact information of an illegal fugitive recovery agent. Rodriguez himself was a qualified, licensed and appointed bail agent of Bankers from 2009 through July, 2020, and of Allegheny and Fidelity

from 2010 through July, 2020, and owner of Free Bird Bail Bonds, in Doral, Florida.

80. Rodriguez could have provided the name of another qualified, licensed and appointed bail agent, but did not. He knew that Yousef at one point had been a temporary bail agent, under the supervision of Eric A. McCray. Per Fla. Stat. § 648.355, a temporary agent may not even do basic recognizance, let alone fugitive recovery, without being under the direct supervision of a qualified, licensed and appointed bail bond agent. But Eric McCray was not appointed by either AIA Group or Bankers Group. And, even Yousef's temporary bail agent license had expired on May 10, 2017.

81. On or about June 26, 2017, on Foltz's behalf, Holland/Holland, Inc. contacted and retained the bounty hunter Yousef to return Howard to California. Yousef agreed to take $ 350 for the job. Holland/Holland, Inc. furnished him with Defendants AIA Group forms and documents, including a controlled document. Yousef reported back July 7, 2017 and August, 10, 2017, that he had made multiple trips to the residence. Figure 12.

82. Meanwhile, on August 14, 2017 Foltz filed a motion with the Superior Court, County of El Dorado, to extend time up to 180 days to set aside the bail forfeiture. He attached the Declarations (affidavit) of Foltz and Holland/Holland, Inc. dated August 10, 2017. Foltz attested that Holland has Florida fugitive recovery counterparts, and he brought Holland in on the investigation "to assist in locating Howard and returning him to that court." Holland attested that he contacted Suleiman Yousef , a "Fugitive Recovery Agent," to locate and return Howard to El Dorado County, California. The Motion was heard on September 15, 2017 and granted, giving Foltz until March 14, 2018 to "retrieve" Howard.

83. After the aborted attempt of November 13, 2017, Foltz, Holland, and Holland, Inc.

24

persisted in their attempts to return Howard to California. Holland/Holland, Inc. emailed Yousef, telling him he still needed the job done, and offered to raise his fee to $ 750 on the forged bail contract.

84. On or about February 14, 2018, Holland/Holland, Inc. emailed Defendant Whalen at AIA Group saying Yousef's been doing a great job, but he needs more names.

85. On or about February 15, 2018, Whalen  provided the name of Rolando Betencourt to Holland/Holland, Inc., and told him to introduce himself saying that AIA and Vice-President Ed Sheppard said he could help. Rolando Betencourt turned Holland/Holland, Inc. down.

86. On or about February 21, 2018 internal emails between executive Ed Sheppard and Whalen, show that Rolando Betencourt was unwilling to take the case because there was no record of Howard's bail bond or warrant being listed in the National Crime Information Center (NCIC).

87. On or about January 31, 2019, Plaintiffs obtained a public records request of Detective Jose Andrade's casenotes stating that Rodriguez of Free Bird Bail Bonds spoke with Holland on the telephone and suggested Yousef, who didn't work for his agency but was "temping" at the time for different bail agencies. On April 12, 2019, Plaintiffs obtained a public records request of Detective Andrade's deposition dated December 19. 2018, corroborating this.

88.  Meanwhile, in two weeks of public hearings commencing September 4, 2018, the State of California Commission on Judicial Performance (CJP) heard testimony on charges of judicial misconduct, including the judge funneling five (5) defendants to CHI, the private probation service provider where the judge's son works; failing to disclose that his son worked on paid commission for CHI and made reports to the court; ordering a defendant to pay

25

restitution to CHI in violation of the law, based upon a letter from his son; failing to disclose that CHI's owner, Holland, was his friend and former client and attended strategy meetings for the judge's judicial campaign; appointing attorney Clark as a special master in a matter pending before the judge without disclosing Clark was a personal friend; and receiving gifts from Clark.[9]

89. Testimony at the hearings was that in five cases between October 2009 and April 2014, Judge Bailey had released a defendant charged with an alcohol-related crime on the defendant's own recognizance, on condition that the defendant participate in the Secure Continuous Remote Alcohol Monitoring (SCRAM) program. SCRAM monitors alcohol consumption through a bracelet device provided to defendants.  At the time the orders were entered, CHI was the only local  provider of alcohol monitoring services. Judge Bailey's son, John Bailey, was employed by CHI as a case manager and worked on commission. He received a percentage of the payments CHI received from every SCRAM participant he monitored. John Bailey installed the SCRAM device, monitored for violations, wrote reports for the court, set up payments, and was "the face of CHI." In each of the five cases, John Bailey or another CHI employee sent correspondences directly to Judge Bailey concerning the defendants' participation in SCRAM. The five cases and dates of the orders are:

       i  People v. Angelica Godinez, April 16, 2014;

      ii. People v. Julian Butler, March 10, 2014;

     iii. People v. Shawn Price, February 19, 2014;

     iv. People v. Jason Jacobsen, October 30, 2009; and

---

[9] See,
https://cjp.ca.gov/wp-content/uploads/sites/40/2019/02/Bailey_DO_Censure_Bar_02-27-19.pdf.

v. People v. Camille DeSpain, October 23, 2009.

Extensive evidence was introduced in the CJP proceedings that Judge Bailey had a history of

CHI's employees and agents claiming it was owed debts, and the judge then unlawfully ordering

defendants to pay those debts.

90.  When ordering defendants to CHI, Judge Bailey had neither disclosed to Howard, nor

to any of the above defendants, during the course of his judicial career, his relationship with

Holland/Holland, Inc., the owner of CHI, or the fact that his son worked on commission for CHI

and made compliance reports to the judge. Nor did he disclose  that prior to taking the bench,

Judge Bailey had represented Holland, referred bail clients to him, and Holland had referred

clients to the judge; or that Holland had been to the judge's home, had attended strategy meetings

for the judge's judicial campaign, and was a personal friend; or that Holland/Holland, Inc.'s

attorney, Bradley Clark, was also friends with the judge; had given gifts  on January 21, 2012 ($

50 tickets), September 25, 2011 ($ 42 gift of golf fees), January 22, 2011 ($50  tickets),

September 9, 2010 ($ 150 gift of tickets), and January 18, 2010 ( $50 gift of tickets) to the judge;

and employed his nephew in his law office.

91. On or about February 27, 2019, the California agency imposed the harshest penalties

allowed by the California Constitution, namely, the CJP censured the former Judge, and barred

him from ever seeking or holding judicial office with any court in the State of California. Former

Judge Bailey's Petition for Review was denied by the California Supreme Court, and the CJP's

decision became final on or about July 31, 2019 .

92. Defendants, Allegheny and Fidelity also engaged in racketeering behavior involving

bounty hunters in Eugene Deshane Mitchell, Shayleen Meuchell, on their own behalf and as next

27

friend of B.M., Plaintiffs, v. First Call Bail and Surety, Inc.; Allegheny Casualty Company;
International Fidelity Insurance Company; the Montana Civil Assistance Group; Michael
Ratzburg; Van Ness Baker, Jr.; and Jason Haack. Defendants, Case No. 9:10-cv-0067-DLC (filed
4/17/2019) United States District Court, D. Montana. On similar facts, a Montana family was
stalked, hunted down, and had their front door broken in by bounty hunters who charged into
their bedroom with guns and rifles to kidnap the bailee, on a misdemeanor traffic charge. Unlike
this case, Allegheny and Fidelity actually had a contract with plaintiffs.[10] Notably, unlike Florida,
Montana is one of the few states that doesn't have statutes regulating fugitive recovery agents,
effectively allowing some form of limited bounty hunting.

93. AIA Group, in *other* cases, provides Foltz, Holland, and Holland, Inc. with form bail
bond contracts for the bailees that fail to conform to state law by authorizing illegal conduct, thus
making illegal conduct their normal way of doing business. See, AIA Group blank contracts
attached hereto as "Ex. H" and "Ex. I."

94. Defendant Yousef was and is a bounty hunter who kidnapped for reward multiple
victims, and in committing these offenses, either transported the person in interstate commerce,
traveled himself in interstate commerce, or used a means, facility or instrumentality of interstate
commerce, such as his cellphone or GPS. On similar facts, an Ohio bounty hunter, Shane
Hammond, was indicted 1/8/2018 for Kidnapping (18 U.S.C. § 1201 (a)(1) and Impersonating an

---

[10]Mitchell v. First Call Bail and Surety, Inc., Allegheny Casualty Company, et al, 412 F.
Supp. 3d 1208, 1214 (D. Montana 2019)(denying motions to dismiss of sureties); Mitchell,425 F.
Supp. 3d 1256 (D. Mont. 2019)(granting summary judgment against Allegheny and Fidelity
declaring two provisions of their bail bond contract unenforceable, namely a hold harmless
clause and waiver clause).

Agent of the United States (18 U.S.C. § 913) in <u>United States of America v. Shane Ryan</u>
<u>Hammond</u>, Case No. 2:17-cr-00246 (filed 10/20/2017) United States District Court, S. D. Ohio.
Hammond owned and operated the Midwest Fugitive Task Force, seeking out employment
activities as a bail recovery agent for himself and other employees. Yet Hammond was not
licensed to act as a bail recovery agent in the States of Ohio, West Virginia or Michigan. On "at
least nine (9) occasions, Hammond knowingly and unlawfully kidnapped a person for reward,
and in committing these offenses, either transported the person in interstate commerce, traveled
himself in interstate commerce, or used a means, facility or instrumentality of interstate
commerce, such as his cellphone or GPS." Like Yousef, he dressed in "all-black tactical uniform
with a black ballistic/load bearing vest carrying multiple handguns...a Taser, and usually one or
two law enforcement style badges... a large back patch reading 'AGENT,'" and he had a body
camera – and had recorded hours of disturbing footage of himself kidnapping his victims. On
April 12, 2018, a Superceding Information charged him with the original two counts, and added
three more counts including two counts of Wire Fraud, in violation of 18 U.S.C. § 1343.[11]

**Bail Industry Specific Laws That Made it Kidnapping and Not Fugitive Recovery**

95. Two things made the actions Defendants took to retrieve Howard  "kidnapping," and
not fugitive recovery:

       a. acting upon a false contract; and

       b. utilizing an illegal recovery agent or bounty hunter.

96. When Foltz filed false records on November 28, 2016, purporting to cancel Bankers'

---

[11]Hammond pled guilty to the five counts and on 6/19/2019 was sentenced to 15 years
incarceration.

bail bond contract and then forged a bail bond with Allegheny, all Defendants were made aware of the actions he committed, making them part of the conspiracy. The false records and forged bail contract fall within the common purposes of the conspiracy. Even if defendants had used a qualfied, licensed and appointed agent to return the bailee to the court, that would be kidnapping because they were acting upon a forged contract.

97. The fact that Defendants chose to use an illegal recovery agent or bounty hunter not qualified, licensed and appointed, also makes the attempted retrieval kidnapping.

98. Beginning in or about 2016 and continuing, Defendants did knowingly and intentionally conspire to violate the following federal and state statutes:

      a. Acts involving false bail:

        i. 18 U.S.C. § 1506 (false bail punishable by fine or imprisonment up to 5 years).

      b. Acts involving state statutes regulating the bail industry:

        i. Fla. Stat. § 648.30 (1)(bail bond agent must be qualified and licensed by the State, and appointed by the insurer; punishable by fine or imprisonment up to 5 years);

        ii. Fla. Stat. § 648.30 (2)(a person may not represent himself to be a bail enforcement officer, bounty hunter, or other similar title; punishable by fine or imprisonment up to 5 years ); and

        iii. Fla. Stat. § 648.30 (3)(any licensee who knowingly aids or abets an unlicensed person in violating this section is punishable by fine or imprisonment up to 5 years).

### **GENERAL RICO ALLEGATIONS**

**A. Persons**

99. Plaintiffs are "persons" with standing to sue within the meaning of RICO, 18 U.S.C. § 1961(3) and 1964 (c).

100. Defendants are each a RICO "person" within the meaning of 18 U.S.C. § 1961(3) because each is an entity or individual capable of holding a legal or beneficial interest in property.

**B. The RICO Enterprises**

101. The RICO Enterprises consist of one RICO Enterprise association in fact of all Defendants, and, alternatively or additionally, multiple single or multiple entity associations in fact enterprises:

<u>i. The RICO Enterprise of all Defendants</u>

102. At all times relevant, Defendants AIA Group, Bankers Group, Foltz, Holland, Holland, Inc., Whalen, Kesnick, Rodriguez and Yousef, constituted an "enterprise," as defined in 18 U.S.C. § 1961(4), that is a group of individuals associated in fact, although not a legal entity. The enterprise constituted an ongoing organization whose members functioned as a continuing unit for a common purpose of achieving the objectives of the enterprise, to illegally retain or extort bail and bail premium. All acted in concert to make their cut of the premium or bond. It is a lawful purpose carried out through fraudulent means. The activities of the enterprise affect interstate and foreign commerce.

103. Defendants' racketeering conduct as to Plaintiffs began in or about May, 2014 and continues to date. However, Defendants, Foltz, Holland, and Holland, Inc. have had a relationship with Whalen from 2005 on, while Whalen was Executive Vice-President of Bankers

31

and BSSI, and managed them. It was a profitable arrangement. South Lake Tahoe and Placerville are two small rural mountain towns. South Lake Tahoe has a population of approximately 21,403, and Placerville has a population of approximately 10,740. Despite this, from 2004 to 2016 Holland, Inc. wrote bond liability value for Bankers totaling $ 191,589,013, and Foltz as subproducer wrote bond liability for Bankers totaling $ 56,554,363, a total of a quarter of a billion dollars over a twelve (12) year period. When Whalen left Bankers for AIA Group in 2011, Defendants, Foltz, Holland, and Holland, Inc. followed him to AIA Group in July and August, 2015.

104. AIA Group and Bankers Group are vicariously responsible for the wrongful acts of its employees (agents) because the acts are: (1) related to and committed within the course of employment; (2) committed in furtherance [of the business] of the corporation; and (3) authorized or subsequently acquiesced in by the corporation, where, as here, the principal "derived some benefit from the RICO violation."

105. Among other things, liability for AIA Group is based on the fact that Foltz, Holland, and Holland, Inc. were each, and are, agents appointed to transact on behalf of these companies and thus the offenses of the agents are imputed to the principal companies, and Whalen, an officer or director at the executive level for AIA Group, concurred in the predicate acts of Foltz, Holland, and Holland, Inc.

106. Allegheny and Fidelity, through AIA, exercise control over the bail bond agents with whom they work.

107. Among other things, liability for Bankers Group is based on the fact that Foltz, Holland, and Holland, Inc. were and are, agents appointed to transact on behalf of these

companies, and thus the offenses of the agents are imputed to the principal companies, and

Kesnick, an officer or director at the executive level for Bankers Group, concurred in the

predicate acts of Foltz, Holland, and Holland, Inc.

108. Bankers and BIG, through BSSI, exercise control over the bail bond agents with
whom they work.

109. Both AIA Group and Bankers Group create the environment that bred the acts

alleged herein through producer contracts with the bail bond agents Foltz, Holland, and Holland,

Inc., that because they require the agents to bear all risk of financial loss, incentivize them to hire

illegal outside agents or to undertake aggressive bounty hunting activity themselves.

110. No Defendant, nor anyone else, has paid anything to South Lake Tahoe Superior Court

of California, County of El Dorado, on Howard's purportedly forfeited and fraudulently entered

bail bond.

111. If Foltz and Bankers Group were displeased with the terms of the contract, Foltz had

every opportunity, including after oral argument November 20, 2015, to simply walk Howard

from the courtroom to the jail. Haas would have posted a cash bail through the clerk during

business hours, and that would have lawfully ended Defendants' bail bond contract and liability

to the court.

112. But that was unacceptable to the RICO scheme of obtaining maximum illegal

premiums by deliberately misrepresenting the amount of money due and owing on the bail;

misappropriating the payment on the "cancelled" bail bond; and willful nondisclosure of material

information even in the absence of any patently false statements, including cancelling the

Banker's bail contract and forging an Allegheny "contract." They targeted Haas, a Miami

attorney, in this scheme.

113. At all times attempting to enforce Howard's rights, Plaintiffs contested the proceedings from  May 4, 2014 through March 14, 2018 with the Lake Tahoe Superior Court of California, County of El Dorado. But the decisions were infected by undisclosed conflict of interest and bribes. Plaintiffs' legal attempts in El Dorado County, albeit unsuccessful, incurred over $ 10,000 in legal fees and expenses. These expenses incurred in attempts to combat Defendants' RICO violations through the legal system are recoverable as business or property damages in this civil RICO action.

114. Foltz used Bankers' Power of Attorney to write, and later "cancel" the Bankers' bail bond. Foltz used Allegheny's Power of Attorney to write a false bail bond. Bail sales agent Foltz was each time, through his Power of Attorney with Bankers or with Allegheny, within his contractual scope of authority.

115. When Foltz handed the clerk the new Power of Attorney on the fraudulent bail contract and invested the $ 200 proceeds from the wrongfully retained Bankers/BIG  premium into the operation of the RICO enterprise, Foltz was investing racketeering proceeds to commit more racketeering acts, making Plaintiff Howard fund his own extortion.

116. Kesnick, Bankers Senior Vice-President and BSSI's CEO/President, knew Foltz had no authority to cancel Bankers' bail bond and switch it to Allegheny. On February 13, 2017, when the El Dorado Court forfeited the forged bail bond with Allegheny, Kesnick had confirmation that the El Dorado Court had willingly accepted the cancellation of Bankers' bail bond. Only then did Kesnick complete and wire a Bail Agent Action Notice to the California Department of Insurance terminating Foltz's agency with Bankers, while falsely stating "N/A" to

the question of whether Bankers was terminating the appointment because of "reason to believe the agent may have violated the California Insurance Code." This was a patently false statement, and nondisclosure of material information.

117. AIA Group participated and conspired to send enforcers to Plaintiffs' home/law office to return Howard to California, to further their extortion scheme on the forged bail bond. On or about June 19, 2017, Jimmy Moscoso, Loss Control Manager for AIA Group provided the name of Rodriguez to Whalen, who provided it to Holland/Holland, Inc. On or about June 26, 2017, Rodriguez, knowingly and intentionally recommended Yousef to Holland/Holland, Inc. He was familiar with Yousef's videos, and indeed, after the November 13, 2017 attempt, Yousef forwarded that video not only to Holland, but also to Rodriguez. As Rodriguez was an agent of Bankers and Allegheny, in order to maintain or advance his position within the organization, it was required, when asked, that he would refer people within the RICO enterprise to persons not qualified, licensed or appointed as bail agents, thus willfully violating state law.

118. Had the kidnapping been completed on November 13, 2017, it would satisfy all of the elements of a substantive Rico offense. Howard would have been brought back to Tahoe, likely would have paid the $25,000 bail to Foltz and/or Holland/Holland, Inc., or Haas would have paid $25,000 cash for his release. But still, Judge Bailey would have ordered ankle monitoring and monthly payments to CHI, where his son would receive commissions.

119. With the false bail extended until March 14, 2018, Defendants AIA Group, Whalen, Foltz, Holland/Holland, Inc. persisted in their attempts to retrieve Howard to California.

120. The activities of the enterprise affect interstate and foreign commerce.

ii. The Multiple Entity Association in Fact RICO Enterprise of the California

35

> Defendants Foltz, Holland, and Holland, Inc. with their California Based Bail Agencies of South Shore Bail Bonds, Agency Bail Bonds of Tahoe, Gold Country Bail Bonds, Charles Holland Bail Bonds, Aaronic Bail Bonds, Hangtown Bail Bonds, Absolve Bail Bonds, and North State Bail Bonds

121. Alternatively or cumulatively, Defendants Foltz, Holland, and Holland, Inc. have a multiple entity association in fact RICO Enterprise with their California Based Bail Agencies of South Shore Bail Bonds and Agency Bail Bonds of Tahoe as to Foltz, and Gold Country Bail Bonds, Charles Holland Bail Bonds, Aaronic Bail Bonds, Hangtown Bail Bonds, Absolve Bail Bonds, and North State Bail Bonds as to Holland/Holland, Inc.

122. Defendant Foltz was a licensed and appointed bail agent/subproducer of Bankers from February, 2005 until February 13, 2017, with Holland his general agent/supervising producer from February, 2005, and Holland, Inc. from January, 2013. Alternatively, Foltz's employer effective February 9, 1999 is Holland, and Foltz is authorized to transact on behalf of Holland, Inc. effective December 13, 2007. Foltz also is and was an authorized agent/producer named and appointed to transact on behalf of AIA Group effective August 8, 2015.

123. Foltz is also an employee of Holland/Holland , Inc. and part of a Multiple Entity Association with all of Holland/Holland, Inc.'s bail bond companies. At all pertinent times, on the front of South Shore Bail Bonds, Foltz displays an approximately six (6) foot wide flag of the State of Jefferson, which claims independent sovereignty, and is a proposed U.S. state that would span the contiguous, most rural area of Southern Oregon and Northern California. Thus Foltz, and his bail agency, claim to belong to their own fictional state, with the laws of California not applying. The flag is also a coded message to out of state bounty hunters that he would help them outside California law.

36

124. Defendant, Holland was and is an authorized general agent/supervising producer named and appointed to transact on behalf of Bankers Group effective April 13, 1998, and was and is an authorized agent/producer named and appointed to transact on behalf of AIA Group effective July 27, 2015. Holland was Foltz's general agent/supervising producer from February, 2005, and his employer from February 9, 1999.

125. Holland, Inc. is and was an authorized general agent/producer named and appointed to transact on behalf of Bankers Group effective December 13, 2007. Holland, Inc. is and was an authorized agent to transact on behalf of AIA Group effective July 27, 2015. Holland, Inc. also does business as "CHI," providing probation services of electronic monitoring for out-of-county residents for the El Dorado County Probation Department, which for a bail agent is a prohibited association.[12]

126. Holland is and was a personal friend of Former Judge Bailey. Prior to the judge taking the bench, Judge Bailey had represented Holland and his bail bond business; referred bail clients to him; Holland had referred clients to the judge; had been to the judge's home, and actively participated in strategy meetings for the judge's judicial campaign. Judge Bailey's son worked on commission for CHI, and made compliance reports to the judge, who ordered defendants to CHI, without ever disclosing the relationship with Holland/Holland, Inc., the owner of CHI. Holland/Holland, Inc.'s attorney, Bradley Clark, was also personal friends with the judge; had

---

[12]Defendant Holland and Holland, Inc. a/k/a CHI is regularly or frequently employed by or associated with a court of law in respect to is exercise of criminal jurisdiction, or a public law enforcement agency possessing the power of arrest and detention of persons suspected of violating the law. For a bail bondsman, this is a prohibited association, and grounds for revocation of his bail license per Cal. Code Regs. tit. 10, art. 2, § 2057 Prohibited Associations (2013). Florida has a similar prohibition at Fla. Stat § 648.44(2)(c),(f)(2004).

given multiple gifts to the judge, and employed the judge's nephew in his law office. These conflicts of interest and bribes were undisclosed, and infected the County of El Dorado proceedings for Howard and other bailees.

127. Holland/Holland, Inc. assigned unnamed bail agent employees on or about the end of March, 2014 through July, 16, 2014 to follow the movements of the contender for District Attorney, El Dorado County, Judson Henry. This interference with an election included retrieving Judson Henry from his daughter's soccer game and taking him to Holland's office, after which meeting Mr. Henry resigned from the election, and the current District Attorney ran unopposed. This enterprise has a close relationship with the District Attorney's office. Curiously, in South Lake Tahoe, the prosecutors claim they have no say in plea offers, only the judge has.

128. Foltz, Holland, and Holland, Inc. used the court proceedings in El Dorado County as part of their pattern of racketeering, including extortion under color of official right to collude with former Judge Bailey to increase Defendants' share of bail bond premiums. The pattern includes bailees from all over the state and country accepting mandatory probation with monitoring through the bail agent, offered by the judge, not the prosecutor. The extortionate scheme involved raising bail bonds and their premiums, imposing remote monitoring expenses via CHI, and even forged bail bonds. The activities of the enterprise affect interstate and foreign commerce.

129. When Foltz filed false records on November 28, 2016, purporting to cancel Bankers' bail bond contract and then forged a bail bond with Allegheny, the sureties were made aware of the actions he committed. By Bankers illegally retaining the $ 200 premium, they deprived Howard of property that would have otherwise been put to use in interstate comerce.

130. When Foltz handed the clerk the new Power of Attorney on the fraudulent bail contract and invested the $ 200 proceeds from the wrongfully retained Bankers/BIG premium into the operation of the RICO enterprise, Foltz was investing racketeering proceeds to commit more racketeering acts, making Plaintiff Howard fund his own extortion.

131. The false records and forged bail contract fall within the common purposes of the enterprise. Even if defendants had used a qualified, licensed and appointed agent to return the bailee to the court, it would still be kidnapping because they were acting upon a forged contract.

132. The fact that Defendants chose to use an illegal recovery agent or bounty hunter not qualified, licensed and appointed per state law, also makes the attempted retrieval kidnapping.

133. At all times attempting to enforce Howard's rights, Plaintiffs contested the proceedings from May 4, 2014 through March 14, 2018 with the Lake Tahoe Superior Court of California, County of El Dorado. But the decisions were infected by undisclosed conflict of interest and bribes. Plaintiffs' legal attempts, albeit unsuccessful, incurred over $ 10,000 in legal fees and expenses. These expenses incurred in attempts to combat Defendants' RICO violations through the legal system are recoverable as business or property damages in this civil RICO action.

134. The activities of the enterprise affect interstate and foreign commerce.

### iii. The Single Entity Association in Fact RICO Enterprise of Defendant Rodriguez and Free Bird Bail Bonds

135. Alternatively or cumulatively, Defendant Rodriguez, at all times material hereto, was a qualified, licensed and appointed bail agent of Bankers from 2009, and of Allegheny and Fidelity from 2010, both through July, 2020. He had a Single Entity Enterprise with Free Bird

39

Bail Bonds, which he owned. Rodriguez, with AIA's Group's Jimmy Moscoso and Whalen, brokered Holland/Holland, Inc. to Yousef, an illegal recovery agent and bounty hunter. In order to maintain or advance his position within the organization, it was required when asked by people within the enterprise, Rodriguez would refer qualified, licensed, and appointed bail agents to an illegal recovery agent and bounty hunter, not qualified, licensed and appointed, thereby willfully violating state law. The activities of the enterprise affect interstate commerce.

136. Rodriguez knew of Yousef's violent videos posted on social media. Thus from the executives at AIA Group and Bankers Group, down to the various qualified, licensed and appointed bail agents of Allegheny and Bankers, all Defendants participated in the enterprise.

### iv. The Single Entity Association in Fact RICO Enterprise of Defendant Yousef and International Defense Organization Corp.

137. Alternatively or cumulatively, Defendant Yousef, at all times material hereto, was an illegal recovery agent and bounty hunter who had a single entity RICO Enterprise with his bail agency/office, International Defense Organization Corp. (IDO) at least from September 27, 2013 through September 22, 2017, and since April 15, 2021, with International Defense Organization, LLC (collectively referred to as "IDO").

138. Yousef was and is a bounty hunter who kidnapped for reward multiple victims, and in committing these offenses, either transported the person in interstate commerce, traveled himself in interstate commerce, or used a means, facility or instrumentality of interstate commerce, such as his cellphone or GPS. The rules of his enterprise is to dress in all-black tactical uniform with black ballistic vest, openly carry firearms and Taser, carry and display at least one law enforcement style badge, wear a large patch on his vest reading 'AGENT,' and wear a body

40

camera on his chest recording footage of himself kidnapping his victims, which are then displayed to the public on social media. He promotes his bail agency office on the internet, but was not qualified, licensed, and appointed as a bail agent, nor was he ever appointed by AIA Group or Bankers Group.

139. The purpose of the enterprise is to allow Yousef to engage in work as a recovery agent and bounty hunter in violation of:

   i. Fla. Stat. § 648.30 (1)(bail bond agent must be qualified and licensed by the
      State, and appointed by the insurer; punishable by fine or imprisonment
      up to 5 years)

   ii. Fla. Stat. § 648.30 (2)(a person may not represent himself to be a bail enforcement
       officer, bounty hunter, or other similar title; punishable by fine or imprisonment
       up to 5 years)

   iii. Fla. Stat. § 775.0846 (possession of bulletproof vest while committing or
        attempting to commit offenses including kidnapping, felony of the third degree)

It was also to sell forged and false State of Florida Security Officer/Fraudulent Training Certificates. The activities of the enterprise affect interstate and foreign commerce.

**C. The RICO Purpose**

140. The purpose of the RICO enterprise included the following, among others:

   a. To enrich the members and associates of the enterprise (bail industry participants),
      through, among other things, kidnapping and attempted kidnapping, extortion and
      extortion under color of official right, collection of unlawful debt, bribery, money
      laundering, mail and wire fraud, witness intimidation and violence, and obstruction

41

of justice.

b. To act in concert to make their cut of the bail bond premiums, including to illegally retain or extort bail premiums, and to defraud Plaintiffs and others by preparing false documents and forged bail bonds.

c. To protect the enterprise and its members and associates from detection, apprehension, and prosecution by law enforcement.

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

## COUNT I – RICO § 1962 (c) – ALL DEFENDANTS – PATTERN OF RACKETEERING ACTIVITY

Plaintiffs re-allege and adopt ¶¶ 1- 140, and further state:

141. At all times relevant, Defendants AIA Group, Bankers Group, Foltz, Holland, Holland, Inc., Whalen, Kesnick, Rodriguez and Yousef constituted an "enterprise," as defined in 18 U.S.C. § 1961(4), that is a group of individuals associated in fact, although not a legal entity. The enterprise constituted an ongoing organization whose members functioned as a continuing unit for a common purpose of achieving the objectives of the enterprise, for the common purpose to illegally retain or extort bail and bail premiums. All acted in concert to make their cut of the premium or bail bond. It is a lawful purpose carried out through fraudulent means. The activities of the enterprise affect interstate and foreign commerce.

142. Culpable entities are Defendants AIA Group and Bankers Group, all legitimate businesses used for an improper purpose, and individuals such as Whalen for AIA Group and Kesnick for Bankers Group, who as officers or directors have some part in directing the enterprise's affairs; Defendant Holland, Inc. operates through Holland, at the managerial or

42

supervisory level with some part in directing the enterprise's affairs. Foltz also has some part in directing the enterprise's affairs. Rodriguez and Yousef assist the enterprise.

143. All entities function as a continuing unit. The relationships among those associated with the enterprise has a hierarchical structure, flowing from Defendants AIA Group and Whalen; Bankers Group and Kesnick, to Foltz, Holland, and Holland, Inc., Rodriguez and to Yousef and other unnamed enforcers. At the top, Allegheny and Fidelity, Bankers, BIG and BSSI underwrite the bail bonds, but rely on local bond agents with powers of attorney to secure clients. AIA closely monitors and controls Defendants Foltz, Holland, and Holland, Inc. who deal directly with Yousef and other unnamed enforcers. The individuals do not act independently and without coordination.

144. At all times relevant, each Defendant has knowingly and purposefully committed at least two predicate acts as enumerated herein. The predicate acts are related both to each other (horizontal relatedness), and to the enterprise as a whole (vertical relatedness). The predicate acts are a regular way of conducting an ongoing legitimate business, and can be attributed to Defendants operating as part of a long-term association that exists for criminal purposes.

145. At all times relevant, in furtherance of the criminal enterprise, all Defendants knowingly and purposely engaged in a pattern of racketeering activity included, but not limited to:

> a. 18 U.S.C. §1201 (kidnapping) as to Howard, "attempt to willfully transport across a state boundary or travels or uses any means, facility or instrumentality of interstate commerce;" Fla. Stat. § 777.011 (principal in first degree who "aids, abets, counsels, hires, or otherwise procures such offense to be committed"); and

Fla. Stat. § 777.04 (attempts, solicitation, and conspiracy and such offense is committed or attempted to commit Fla. Stat. § 787.01)

b. Fla. Stat. § 787.01 (kidnapping) as to Haas, forcibly, secretly, or by threat confining, abducting, or imprisoning another person against her or his will and without lawful authority, with intent to:

1. Hold for ransom or reward or as a shield or hostage.

2. Commit or facilitate commission of any felony.

3. Inflict bodily harm upon or to terrorize the victim or another person.

4. Interfere with the performance of any governmental or political function.

and Fla. Stat. § 777.011 (principal in first degree who "aids, abets, counsels, hires, or otherwise procures such offense to be committed"); and Fla. Stat. § 777.04 (attempts, solicitation, and conspiracy and such offense is committed or attempted to commit Fla. Stat. § 787.01)

ii. Hostage taking in violation of:

a. 18 USC § 2332b(g)(5)(B)(i) as to 18 USC § 1203 (relating to hostage taking) – as to Haas, "seizes or detains and threatens to kill, to injure, or to continue to detain another person in order to compel a third person to do an act as an explicit or implicit condition for the release of the person detained (not knowing where Howard was, to flush him out), or attempts or conspires to do so

iii. Extortion and extortion under color of official right in violation of :

a. 18 U.S.C. § 1951 (interference with commerce by robbery or extortion or

attempts or conspires to do so) as to Howard/Haas

    b. 18 U.S.C. §1952 (interstate travel or mail in aid of racketeering enterprise)

iv. Bribery in violation of:

    a. Ca. Penal Code § 92 (bribes; judicial officer; giving or offering as to Howard/Haas

v. Money laundering in violation of:

    a. 18 U.S.C. § 1956 – concealing or disguising the source of funds of unlawful activity, namely false bail as in 18 U.S.C. § 1506 (false bail) – with Foltz using his Allegheny and Bankers Powers of Attorney within his scope of authority as to Howard/Haas

vi. Extortionate credit transactions in violation of:

    a. 18 U.S.C. §891(6),(7)(extension of credit) and Fla. Stat. § 687.071(e) (extortionate extension of credit) as to Howard/Haas

    b. 18 U.S.C. § 893 (collection of extension of credit by extortionate means) as to Howard/Haas

vii. Acts involving interstate mail and wire fraud:

    a. 18 U.S.C. § 1341 (mail) – as to Howard/Haas

    b. 18 U.S.C. § 1343 (wire) – as to Howard/Haas

viii. Obstruction of Justice

    a. 18 U.S.C. § 1512 (tampering with a witness, victim, or an informant) as to Haas

146. Said violations occurred as a result of Defendants' use of mail and the telephone lines

in connection with mailing, faxing and making telephone calls in connection with illegally retaining or extorting bail premiums through the use of fabricated documentation and non-existent contracts.

147. The Defendants have engaged in more than two acts of racketeering and therefore engaged in a pattern of racketeering activity as defined in 18 U.S.C. § 1961. Moreover, through the acts set forth herein, the Defendants conducted or participated in, directly or indirectly, the conduct of the enterprise's affairs through a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5).

148. As a direct and proximate result of Defendants' racketeering activities and violations of 18 U.S.C. § 1962(c), Plaintiffs have been, and continue to be, injured in their business and property, including, without limitation, the loss of the $ 200 bail premium, and the loss of hundreds of thousands of dollars, by reason of the violation of 18 U.S.C. § 1962 (c) by Defendants. Plaintiffs also seek the over $ 10,000 in legal fees and expenses incurred in contesting the proceedings from May 4, 2014 through March 14, 2018 with the Lake Tahoe Superior Court of California, County of El Dorado, which decisions were infected by undisclosed conflict of interest and bribes.

WHEREFORE, Plaintiffs prays for judgment against each Defendant for:

a. Compensatory damages according to proof at trial, trebled according to statute, 18 U.S.C. § 1964 (c);

b. Prejudgment interest according to statute; and

c. Plaintiffs' reasonable attorneys' fees and costs according to statute, 18 U.S.C. § 1964(c).

d. Punitive damages; and

e. That the Court orders such other relief as it deems just and appropriate.

**COUNT II – RICO § 1962 (c) – COLLECTION OF UNLAWFUL DEBT**

Plaintiffs re-allege and adopt ¶¶ 1- 140, and further state:

149. At all times relevant, Defendants Allegheny, Fidelity, AIA , Bankers Group, Foltz, Holland, Holland, Inc., Whalen, Kesnick, Rodriguez and Yousef, a union and/or a group of individuals associated in fact, although not a legal entity, for the common purpose to illegally retain or extort bail premium. All acted in concert to make their cut of the premium or bond. It is a lawful purpose carried out through fraudulent means. The association is open-ended and poses a threat of continuity. The activities of the enterprise affect interstate and foreign commerce.

150. Culpable persons are Defendants AIA Group, Bankers Group, all legitimate businesses used for an improper purpose, and individuals such as Whalen for AIA Group and Kesnick for Bankers Group, who as officers or directors have some part in directing the enterprise's affairs; Defendant Holland, Inc. operates through Holland, at the managerial or supervisory level with some part in directing the enterprise's affairs. Foltz also has some part in directing the enterprise's affairs. Rodriguez and Yousef assist the enterprise.

151. All entities function as a continuing unit. The relationships among those associated with the enterprise has a hierarchical structure, flowing from Defendants AIA Group, Bankers Group at the top, to Foltz, Holland, and Holland, Inc., then to Yousef and other unnamed enforcers. At the top, Allegheny and Fidelity, and Bankers, BIG and BSSI underwrite the bail bonds, but rely on local bond agents with power of attorneys to secure clients. AIA closely monitors and controls the Defendants Foltz, Holland, and Holland, Inc., who deal directly with

Yousef and other unnamed enforcers. The individuals do not act independently and without coordination.

152. Upon information and belief, in furtherance of the criminal enterprise, the Defendants knowingly and purposely engaged in the collection of unlawful debt. These acts constitute racketeering activity in violation of 18 U.S.C. § 1962 (c). Said violations occurred as a result of Defendants' use of mail and the telephone lines in connection with mailing, faxing and making telephone calls in connection with illegally retaining or extorting bail premiums through the use of fabricated documentation and non-existent contracts. The collection of unlawful debt is related both to each other (horizontal relatedness), and to the enterprise as a whole (vertical relatedness). The collection of unlawful debt is a regular way of conducting an ongoing legitimate business, and can be attributed to Defendants operating as part of a long-term association that exists for criminal purposes.

153. The Defendants have engaged in one act of unlawful debt, and therefore engaged in a pattern of racketeering activity as defined in 18 U.S.C. § 1961. Moreover, through the acts set forth herein, the Defendants conducted or participated in, directly or indirectly, the conduct of the enterprise's affairs through collection of "unlawful debt" within the meaning of 18 U.S.C. § 1961(6).

154. As a direct and proximate result of Defendants' racketeering activities and violations of 18 U.S.C. § 1962(c), Plaintiffs have been, and continue to be, injured in their business and property, including, without limitation, the loss of the $ 200 bail premium, and  the loss of hundreds of thousands of dollars, by reason of the violation of 18 U.S.C. § 1962(c) by Defendants. Plaintiffs also seek the over $ 10,000 in legal fees and expenses incurred in

contesting the proceedings from May 4, 2014 through March 14, 2018 with the Lake Tahoe Superior Court of California, County of El Dorado, which decisions were infected by undisclosed conflict of interest and bribes.

WHEREFORE, Plaintiffs prays for judgment against each Defendant for:

a. Compensatory damages according to proof at trial, trebled according to statute, 18 U.S.C. § 1964(c);

b. Prejudgment interest according to statute; and

c. Plaintiffs' reasonable attorneys' fees and costs according to statute, 18 U.S.C. § 1964(c).

d. Punitive damages; and

e. That the Court orders such other relief as it deems just and appropriate.

## COUNT III – RICO § 1962 (a) – INVESTMENT OF INCOME DERIVED FROM A PATTERN OF RACKETEERING ACTIVITY

Plaintiffs re-allege and adopt ¶¶ 1- 140, and further state:

155. At all times relevant, Defendants AIA Group, Bankers Group, Foltz, Holland, Holland, Inc., Whalen, Kesnick, Rodriguez and Yousef, constituted an "enterprise," as defined in 18 U.S.C. § 1961(4), that is a group of individuals associated in fact, although not a legal entity. a union and/or a group of individuals associated in fact, although not a legal entity, for the common purpose to illegally retain or extort bail premium. All acted in concert to make their cut of the premium or bond. It is a lawful purpose carried out through fraudulent means. The association is open-ended and poses a threat of continuity. The activities of the enterprise affect interstate and foreign commerce.

156. Culpable persons are Defendants AIA Group, Bankers Group, all legitimate businesses used for an improper purpose, and individuals such as Whalen for AIA Group and Kesnick for Bankers Group, who as officers or directors have some part in directing the enterprise's affairs; with some part in directing the enterprise's affairs; Defendant Holland, Inc. operates through Holland, at the managerial or supervisory level with some part in directing the enterprise's affairs. Foltz also has some part in directing the enterprise's affairs. Rodriguez and Yousef assist the enterprise.

157. All entities function as a continuing unit. The relationships among those associated with the enterprise has a hierarchical structure, flowing from Defendants AIA Group and Whalen; Bankers Group and Kesnick, to Foltz, Holland, and Holland, Inc., Rodriguez and to Yousef and other unnamed enforcers. At the top, Allegheny and Fidelity, and Bankers, BIG and BSSI underwrite the bail bonds, but rely on local bond agents with power of attorneys to secure clients. AIA closely monitors and controls the Defendants Foltz, Holland, and Holland, Inc., who deal directly with Yousef and other unnamed enforcers. The individuals do not act independently and without coordination.

158. Defendants knowingly and purposely invested any income derived, directly or indirectly, from a pattern of racketeering income back into the enterprise. These acts constitute racketeering activity in violation of 18 U.S.C. § 1962 (a). Said violations occurred as a result of Defendants' use of mail and the telephone lines in connection with mailing, faxing and making telephone calls in connection with illegally retaining or extorting bail premiums through the use of fabricated documentation and non-existent contracts. The predicate acts are related both to each other (horizontal relatedness), and to the enterprise as a whole (vertical relatedness). The

predicate acts are a regular way of conducting an ongoing legitimate business, and can be attributed to Defendants operating as part of a long-term association that exists for criminal purposes.

159. The Defendants have engaged in more than two acts of racketeering and therefore engaged in a pattern of racketeering activity as defined in 18 U.S.C. § 1961. Moreover, through the acts set forth herein, the Defendants conducted or participated in, directly or indirectly, the conduct of the enterprise's affairs through a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5).

160. As a direct and proximate result of Defendants' racketeering activities and violations of 18 U.S.C. § 1962(a), Plaintiffs have been, and continue to be, injured in their business and property, including, without limitation, the loss of the $ 200 bail premium, and the loss of hundreds of thousands of dollars, by reason of the violation of 18 U.S.C. § 1962(a) by Defendants. Plaintiffs also seek the over $ 10,000 in legal fees and expenses incurred in contesting the proceedings from  May 4, 2014 through March 14, 2018 with the Lake Tahoe Superior Court of California, County of El Dorado, which decisions were infected by undisclosed conflict of interest and bribes.

WHEREFORE, Plaintiffs prays for judgment against each Defendant for:

a. Compensatory damages according to proof at trial, trebled according to statute, 18 U.S.C. § 1964(c);

b. Prejudgment interest according to statute; and

c. Plaintiffs' reasonable attorneys' fees and costs according to statute, 18 U.S.C. § 1964(c).

d. Punitive damages; and

e. That the Court orders such other relief as it deems just and appropriate.

## COUNT IV – RICO § 1962 (a) – INVESTMENT OF INCOME DERIVED FROM COLLECTION OF UNLAWFUL DEBT

Plaintiffs re-allege and adopt ¶¶ 1- 140, and further state:

161. At all times relevant, Defendants AIA Group, Bankers Group, Foltz, Holland, Holland, Inc., Whalen, Kesnick, Rodriguez and Yousef, constituted an "enterprise," as defined in 18 U.S.C. § 1961(4), that is a group of individuals associated in fact, although not a legal entity. a union and/or a group of individuals associated in fact, although not a legal entity, for the common purpose to illegally retain or extort bail premium. All acted in concert to make their cut of the premium or bond. It is a lawful purpose carried out through fraudulent means. The association is open-ended and poses a threat of continuity. The activities of the enterprise affect interstate and foreign commerce.

162. Culpable persons are Defendants AIA Group, Bankers Group, all legitimate businesses used for an improper purpose, and individuals such as Whalen  for AIA Group and Kesnick for Bankers Group, who as officers or directors have some part in directing the enterprise's affairs; with some part in directing the enterprise's affairs; Defendant Holland, Inc. operates through Holland, at the managerial or supervisory level with some part in directing the enterprise's affairs. Foltz also has some part in directing the enterprise's affairs. Rodriguez and Yousef assist the enterprise.

163. All entities function as a continuing unit. All entities function as a continuing unit. The relationships among those associated with the enterprise has a hierarchical structure, flowing

from Defendants AIA Group and Whalen; Bankers Group and Kesnick, to Foltz, Holland, and Holland, Inc., Rodriguez and to Yousef and other unnamed enforcers. At the top, Allegheny and Fidelity, Bankers, BIG and BSSI underwrite the bail bonds, but rely on local bond agents with powers of attorney to secure clients. AIA closely monitors and controls Defendants Foltz, Holland, and Holland, Inc. who deal directly with Yousef and other unnamed enforcers. The individuals do not act independently and without coordination.

164. Upon information and belief, in furtherance of the criminal enterprise, the Defendants knowingly and purposely engaged in the collection of unlawful debt. These acts constitute racketeering activity in violation of 18 U.S.C. § 1962 (c). Said violations occurred as a result of Defendants' use of mail and the telephone lines in connection with mailing, faxing and making telephone calls in connection with illegally retaining or extorting bail premiums through the use of fabricated documentation and non-existent contracts. The collection of unlawful debt is related both to each other (horizontal relatedness), and to the enterprise as a whole (vertical relatedness). The collection of unlawful debt is a regular way of conducting an ongoing legitimate business, and can be attributed to Defendants operating as part of a long-term association that exists for criminal purposes.

165. The Defendants have engaged in one act of unlawful debt, and therefore engaged in a pattern of racketeering activity as defined in 18 U.S.C. § 1961. Moreover, through the acts set forth herein, the Defendants conducted or participated in, directly or indirectly, the conduct of the enterprise's affairs through collection of "unlawful debt" within the meaning of 18 U.S.C. § 1961(6).

166. As a direct and proximate result of Defendants' racketeering activities and violations

53

of 18 U.S.C. § 1962(c), Plaintiffs have been, and continue to be, injured in their business and

property, including, without limitation, the loss of the $ 200 bail premium, and the loss of

hundreds of thousands of dollars, by reason of the violation of 18 U.S.C. § 1962(c) by

Defendants. Plaintiffs also seek the over $ 10,000 in legal fees and expenses incurred in

contesting the proceedings from  May 4, 2014 through March 14, 2018 with the Lake Tahoe

Superior Court of California, County of El Dorado, which decisions were infected by undisclosed

conflict of interest and bribes.

WHEREFORE, Plaintiffs prays for judgment against each Defendant for:

a. Compensatory damages according to proof at trial, trebled according to statute, 18

   U.S.C. § 1964(c);

b. Prejudgment interest according to statute; and

c. Plaintiffs' reasonable attorneys' fees and costs according to statute, 18 U.S.C.

   § 1964(c).

d. Punitive damages; and

e. That the Court orders such other relief as it deems just and appropriate.

## COUNT V – RICO § 1962(d) – ALL DEFENDANTS – CONSPIRACY TO VIOLATE PROVISIONS OF RICO § 1962 (a) and/or (c)

Plaintiffs re-allege and adopt ¶¶ 1- 140, and further state:

167. Beginning in or about 2014 and continuing to date, in the Southern District of

Florida and Eastern District of California and elsewhere, all Defendants did knowingly conspire

to violate 18 U.S.C. § 1962 (c), that is, to conduct and participate, directly and indirectly, in the

conduct of the affairs of the enterprise through a pattern of racketeering activity, as defined in 18

U.S.C. §§§ 1961 (1),(5) and (6), that is, to conduct and participate, directly and indirectly, in the conduct of the affairs of the enterprise through a pattern of racketeering activity consisting of multiple offenses including kidnapping and attempted kidnapping, hostage taking, extortion and extortion under color of official right, bribery, money laundering, collection of unlawful debt, extortionate credit transactions, acts involving interstate mail and wire fraud, and obstruction of justice, as follows:

> i.  Kidnapping, attempting or conspiring, or threatening to commit kidnapping in violation of:

>> a.  18 U.S.C. §1201 (kidnapping) as to Howard, "attempt to willfully transport across a state boundary or travels or uses any means, facility or instrumentality of interstate commerce;" Fla. Stat. § 777.011 (principal in first degree who "aids, abets, counsels, hires, or otherwise procures such offense to be committed"); and Fla. Stat. § 777.04 (attempts, solicitation, and conspiracy and such offense is committed or attempted to commit Fla. Stat. § 787.01)

>> b. Fla. Stat. § 787.01 (kidnapping) as to Haas, forcibly, secretly, or by threat confining, abducting, or imprisoning another person against her or his will and without lawful authority, with intent to:

>>> 1. Hold for ransom or reward or as a shield or *hostage*.

>>> 2. Commit or facilitate commission of any felony.

>>> 3. Inflict bodily harm upon or to terrorize the victim or another person.

4. Interfere with the performance of any governmental or political

function;

and Fla. Stat. § 777.011 (principal in first degree who "aids, abets,

counsels, hires, or otherwise procures such offense to be committed"); and

Fla. Stat. § 777.04 (attempts, solicitation, and conspiracy and such offense

is committed or attempted to commit Fla. Stat. § 787.01)

ii. Hostage taking in violation of:

a. 18 USC § 2332b(g)(5)(B)(i) as to 18 USC § 1203 (relating to hostage

taking) as to Haas, "seizes or detains and threatens to kill, to injure, or to

continue to detain another person in order to compel a third person to do

an act as an explicit or implicit condition for the release of the person

detained (not knowing where Howard was, to flush him out), or attempts

or conspires to do so

iii.  Extortion and extortion under color of official right:

a. 18 U.S.C. § 1951 (interference with commerce by robbery or extortion

or attempts or conspires to do so) and Fla. Stat. § 836.05 (threats;

extortion; felony of the second degree) as to Howard/Haas

b. 18 U.S.C. §1952 (interstate travel or mail in aid of racketeering

enterprise) as to Howard/Haas

iv. Bribery in violation of:

a. Ca. Penal Code § 92 (bribes; judicial officer; giving or offering – as to

Howard/Haas

v. Money laundering in violation of:

    a. 18 U.S.C. § 1956 – concealing or disguising the source of funds of unlawful

    activity, namely false bail as in 18 U.S.C. § 1506 (false bail)

vi. Extortionate credit transactions in violation of:

    a. 18 U.S.C. § 891(6),(7)(extension of credit) and Fla. Stat. § 687.071(e)

    (extortionate extension of credit) as to Howard/Haas

    b. 18 U.S.C. § 893(collection of extension of credit by extortionate means)

    as to Howard/Haas

vii. Acts involving interstate mail and  wire fraud in violation of:

    a. 18 U.S.C. § 1341 (mail) as to Howard/Haas

    b. 18 U.S.C. § 1343 (wire) as to Howard/Haas

viii. Obstruction of Justice in violation of:

    a. 18 U.S.C. § 1512 (tampering with a witness, victim, or an informant as to Haas

168. Each of the state statutes listed consist of felonies punishable by fine or imprisonment in excess of one year.

169. It was a part of the conspiracy that each defendant agreed that a conspirator would commit at least two acts of predicate acts of in furtherance of the racketeering enterprise, or agree to the participate in the conduct of the enterprise with the knowledge and intent that other members of the conspiracy would commit at least two predicate acts in furtherance of the racketeering enterprise.

170. As a direct and proximate result of Defendants' racketeering activities and violations of 18 U.S.C. § 1962(c), Plaintiffs have been, and continue to be, injured in their business and

property, including, without limitation, the loss of the $ 200 bail premium, and the loss of

hundreds of thousands of dollars, by reason of the violation of 18 U.S.C. § 1962(c) by

Defendants. Plaintiffs also seek the over $ 10,000 in legal fees and expenses incurred in

contesting the proceedings from  May 4, 2014 through March 14, 2018 with the Lake Tahoe

Superior Court of California, County of El Dorado, which decisions were infected by undisclosed

conflict of interest and bribes.

WHEREFORE, Plaintiffs prays for judgment against each Defendant for:

a. Compensatory damages according to proof at trial, trebled according to statute, 18

U.S.C. § 1964(c);

b. Prejudgment interest according to statute; and

c. Plaintiffs' reasonable attorneys' fees and costs according to statute, 18 U.S.C.

§ 1964(c).

d. Punitive damages; and

e. That the Court orders such other relief as it deems just and appropriate.

### COUNT VI FOR DECLARATORY RELIEF AND AFFIRMATIVE INJUNCTION AGAINST DEPARTMENT OF FINANCIAL SERVICES, CEO AS TO VIOLATION OF THE FOURTEENTH AMENDMENT RIGHT TO DUE PROCESS 42 U.S.C. § 1983

Plaintiffs re-allege and adopt  ¶¶ 3-6, 22, 34, 54-64, 94, and 97, and further state:

171. Plaintiffs also seek declaratory and injunctive relief against the Chief Financial

Officer, State of Florida Department of Financial Services (FLDFS), pursuant to 28 USC §§

2201 and 2202 for policies as to the content of the Surety/bail Agent Licensee Identification (ID)

Card that are so overbroad and misleading as to violate the Fourteenth Amendment right to due

process and equal protection. 42 U.S.C. § 1983 (1). FLDFS's Surety Agent Licensee ID Card

states the holder of the card has the power to arrest, citing authority contradicted by Fla. Stat.

§ 648.30. Not only does the card not state the pertinent state law, but it contradicts it. Further,

the card wrongly implies that an employer has the power of appointment, rather than only the

surety liable for the bail. An agency for the executive branch has no authority to disregard or

contradict the statutes enacted by the legislative branch.

172. FLDFS'S Surety Agent Licensee ID Card states:

____(name) and ____ (License number) IS LICENSED TO TRANSACT THE
FOLLOWING CLASSES OF INSURANCE Limited Surety (Bail)
Issued: _____(Date)

This licensee has the power of arrest as authorized by Sections 903.22 and 903.29,
Florida Statutes, and Tailor v. Tainter, 83 U.S. 366, 21 L.Ed. 287 (1872).

In small print at the bottom of the Surety Agent Licensee ID Card, it states:

This licensee must have an active appointment with their appointing employer or
insurer(s) to perform any of the functions, duties, or powers prescribed for bail bond
agents or temporary bail bond agents.

See, FLDFS'S Surety Agent Licensee ID Card for Yousef attached hereto as "Ex. I." 183.

173. The card  draws attention to Fla. Stat. §§ 903.22 and 903.29, and a case *Tailor v.*

*Tainter,* all of which emphasize the surety's right to detain a bailee:

174. Fla. Stat. § 903.22 provides:

A surety may arrest the defendant before a forfeiture of the bond for the purpose of
surrendering the defendant or the surety may authorize a peace officer to make the arrest
by endorsing the authorization on a certified copy of the bond.

175. Fla. Stat. § 903.29 provides:

Within 2 years from the date of forfeiture of a bond, the surety may arrest the principal for
the purpose of surrendering the principal to the official in whose custody she or he was at
the time bail was taken or in whose custody the principal would have been placed had she
or he been committed.

176. The Surety Agent Licensee ID Card is overbroad and misleading, and provides no warnings of limitations. Florida law prohibits bounty hunters, and requires any bail agent be qualified and licensed by the State, and appointed by the insurer. Fla. Stat. § 648.30. Licensure and appointment required (2002). The legislature has placed supervisory responsibility for the provisions of this Chapter on the Department of Financial Services. Fla. Stat. § 648.26. Department of Financial Services; administration (2003).

177. It is a function of the FLDFS to determine if a surety agent was qualified, licensed, and appointed, and the Surety Agent Licensee ID Card should clearly reflect these facts. Instead, in the instant case, all it meant on November 13, 2017, was that Yousef had passed a test. It didn't mean that he was qualified, licensed, and appointed. The responding police officers viewed the Surety Agent Licensee ID Card, and were misled.

178. As written in the case notes of the arresting officer, Detective Jose Andrade, FLDFS, Division of Investigative and Forensic Services, Bureau of Insurance Fraud Investigation:

"04/23/2018

On Monday, April 23, 2018, I received a telephone call from Mr. Ralph Steel of Pearson VUE (testing center), regarding Mr. Suleiman Yousef. Pearson VUE is the Division of Financial Services approved testing vendor.

Mr. Steel stated that according to their records, Mr. Yousef was approved to take the testing on 02/10/2017 and he passed the test on 10/30/2017. In accordance to their contract, once Mr. Yousef passed the test, they send out the authorization to prepare the Limited Surety (Bail) license for Mr. Yousef. The license was prepared on 11/01/2017 and mailed out 2-day delivery guarantee.
...
04/30/2018

I have been in communication with Inv. Matthew Guy of the Division of Agent & Agency Services in Tallahassee since the beginning of this case. Inv. Guy has provided information relating to the licensing of Mr. Suleiman Habib Yousef and other information

pertaining to Surety Agents (Bailbonds).

...

Inv. Guy stated that Mr. Yousef had knowledge that his license was not valid until he was Qualified, Licensed and Appointed as specified in Florida Statute 648.30. Inv Guy explained what the statute refers to qualified, licensed and appointed:
-Qualified: The applicant meets all of the requirements for licensure under state statute
-Licensed: The applicant has complied with all of the training requirements and has achieved a passing score in the State Bail Bonds exam.
-Appointed: The licensee has been appointed by a Surety Company to perform Bail Bonds activities under their authorization.

Inv. Guy further explained that a Surity Agent (Bailbond) may not perform any work under a surety company that they have not been appointed. The authorization for a Surety Agent (Bailbond) to act on a bond comes from the surety company.

...

Although Mr. Yousef received his license from Pearson VUE after he passed his test, he was not qualified nor appointed by Bankers Insurance Company. Therefore, Mr. Yousef was in violation of Florida State Statute 648.30 - Licensure and Appointment required.

179. Even worse, the Surety Agent Licensee ID Card relies upon a post-Civil War era case, Taylor v. Taintor, 83 U.S. 366 (1872), which the surety lost in the United States Supreme Court. It appears to reference *dicta obiter* asserting that at common law a bounty hunter had authority to pursue, seize, and return the bail jumper by any means. This principle has been overturned on various fronts, including that:

the Supreme Court was itself the final arbiter of disputes about the common law. This attitude persisted until it was definitively and dramatically discarded by *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 58 S. Ct. 817, 82L. Ed. 1188 (1938)'[which rejected notion of federal common law superior to the rights of the states].

Rodríguez-Tirado v. Speedy Bail Bonds, 891 F.3d 38, 41 (2018)(noting that what the Puerto Rico courts or legislators decide should be the law governing conduct within its own jurisdiction will control regardless of what view of bailer authority is today taken by the Supreme Court). See also, Green v. State, 829 S.W.2d 222 (Tx. App.1992)(murder defendant not entitled to rely on

*Taylor v. Tainter*; "**reliance upon Taylor is unreasonable as a matter of law as it attempts to ignore the changes in law since the nineteenth century** and is an old interpretive opinion in conflict with others and has been overruled in Texas").

180. Florida courts have specifically rejected any reliance on *Taylor v. Tainter*, noting the common law right of a bail bondsman to delegate his authority to an unlicensed agent has been **abrogated by statute**. See, Register v. Barton, 75 So.2d 187 (Fla. 1954)(reversing dismissal of complaint for false arrest against person deputized by surety agent, and remanding to determine if statute had been complied with); Moncrief v. State, Com'r of Ins., 415 So.2d 785 (Fla. 1st DCA 1982)(affirming administrative penalties as to bail bondsman who employed unlicensed runner to assist in apprehension and surrender of defendants, noting Sections 648.25(6) and 648.30, Florida Statutes, must be complied with).

181. Thus, to reference Taylor v. Tainter on the FLDF S Surety Agent Licensee ID Card is wrong, misleading, and fails to comply with present federal and Florida law. It sends the wrong message, whether to police responding to a 911 call, or a judge in a civil or criminal courtroom.

182. The right to break down doors and brandish weapons while seizing a bailee is an right that is fraught with potential danger. It is imperative that police responding to a 911 call, as they did on November 13, 2017, be immediately able to verify whether the suspect is indeed authorized to take actions on a bail contract.

183. Responding officers should have been able to, and must be able to, instantly verify by the FLDFS website that a particular person is indeed a qualified, licensed, and appointed bail agent. In California, the Department of Insurance keeps their bail bondsman license inquiry website accurate in real time, to accurately reflect qualified, licensed, and appointed by the

enumerated listed sureties.

184. But in Florida, the FLDFS Surety Agent Licensee Search had and has a disclaimer:

DISCLAIMER: The most accurate information possible is used, but information found through this service is not guaranteed to be accurate or timely; nor does the Department of Financial Services (DFS) guarantee its suitability for any purpose. DFS does not take responsibility for any inaccuracies or omissions in this data.

Thus, a responding officer to a 911 call must wait until business hours the next day to verify the license search with a telephone call to the FLDFS, precluding an immediate arrest. This is unacceptable and violates Plaintiffs' and any other illegal bounty hunter's victims of their Fourteenth Amendment right to due process and equal protection per 42 U.S.C. § 1983.

185. In the instant case, Yousef was not arrested the night of November 13, 2017. It took the FLDFS until May 31st, 2018 to arrest him on four felonies.

186. This is contrary not only to Florida law, but to Amendment XIV, Section 1, which provides:

nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

U. S. Const., Amendment XIV, ¶ 1. The agency is violating this section by failing to apply and reference the correct law.

187. The FLDFS website should be updated in real time, and carry no disclaimer, so that responding officers can check a computer database or a website, just as they do during a traffic stop as to a driver's license. They then may immediately arrest an illegal bounty hunter.

188. Plaintiffs further submit that the Surety Agent Licensee ID Card should state any action on a bail bond without being qualified, licensed and appointed, or otherwise complying with Florida and Federal law may be considered kidnapping under federal law.

189. Plaintiffs have no adequate remedy at law and will sustain irreparable damage unless Defendant is enjoined from enforcing these misleading policies as to content on the Surety Agent Licensee ID Card, and the inadequate Surety Agent Licensee Search, which harms the people FLDFS serves.

190. These issues are not novel, and this Court is perfectly capable of declaring the Surety Agent Licensee ID Card void as contrary to Florida law and misleading, and the ID license verification process inadequate.

191. 42 USC 1988 (b) provides for prevailing party attorney's fees in an action to enforce civil rights under 42 USC 1983.

WHEREFORE, Plaintiffs respectfully request that this Honorable Court provide the following relief:

a. Assume jurisdiction over this action;

b. Issue a declaration that the FLDFS Surety Agent Licensee ID Card is violative of Florida and Federal law including the Fourteenth Amendment right to due process by placing unnecessary hurdles on the exercise of a protected right to be safe and secure and enjoy equal protection of the laws.

c. Issue an injunction against the FLDFS to immediately remove reference on all issued and to be issued Surety Agent Licensee ID Cards to the *Taylor v. Tainter* case; to reference Fla. Stat. § 648.30. Licensure and appointment required (2002); and warn that failure to comply with Fla. Stat. § 648.30 and applicable state and federal laws may constitute kidnapping and other felonies;

d. Award Plaintiffs reasonable attorney's fees and costs; and

e. Any further relief this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury of all issues triable as a right by jury

By: */s/ Karen J. Haas, Esq.*
  KAREN J. HAAS, ESQ.
  Plaintiff, *Pro Se* and Counsel for Howard
  LAW OFFICES OF KAREN J. HAAS
  13805 S.W. 83rd Court
  Miami, Florida 33158-1027
  TEL: (305) 255-4833
  FAX: (305) 255-4834
  E-MAIL: KJHLaw@gmail.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on February 4, 2022, the undersigned electronically filed the foregoing document with the Clerk of Court using CM/ECF, which will send a Notice of Electronic Filing to all counsel of record that are registered with the Court's CM/ECF system.

By: */s/ Karen J. Haas, Esq.*
  KAREN J. HAAS, ESQ.
  Plaintiff, *Pro Se* and Counsel for Howard
  LAW OFFICES OF KAREN J. HAAS
  13805 S.W. 83rd Court
  Miami, Florida 33158-1027
  TEL: (305) 255-4833
  FAX: (305) 255-4834
  E-MAIL: KJHLaw@gmail.com